GARRISON, Judge.
On April 18, 1982, Genevieve McEwen died at St. Margaret’s Daughters Nursing Home in Orleans Parish. In an olographic will[1], dated March 4, 1977 and written and signed by the decedent, Genevieve McEwen bequeathed her entire estate to her niece, Marion Hartenstein. Mrs. McEwen was preceded in death by her husband and the couple had no children. She was survived only by nieces, nephews, grandnieces and grandnephews, all of whom are plaintiffs in *706 this lawsuit with the exception of Marion Hartenstein, the defendant.
On May 24, 1982, Mrs. Hartenstein filed a petition in the Civil District Court for Orleans Parish asking the court to probate the olographic will of March 4,1977, and to put her in possession of Mrs. McEwen’s estate. Following the probate of this will, the plaintiffs filed a petition to annul the probated testament claiming that the olo-graphic will was invalid because the decedent lacked testamentary capacity at the time of the will’s confection. The plaintiffs claim that the decedent was not of sound mind at that time and that they are entitled to participate in the decedent’s estate as her collateral heirs.
Mrs. McEwen was interdicted on November 17, 1976 by order of the Civil District Court for Orleans Parish. This interdiction was based upon the medical opinion of Dr. R. Travis Kenny whose last visit with Mrs. McEwen was on June 11, 1976. In an opinion dated September 30, 1976, Dr. Kenny stated that Mrs. McEwen was suffering from arteriosclerotic cardiovascular disease and that she was senile and unable to take care of herself and her property. Shortly after the interdiction, Mrs. McEwen entered St. Margaret’s Daughters Nursing Home where she remained until her death.
At trial, Dr. Kenny testified that it was his opinion that Mrs. McEwen’s condition would not have improved after the interdiction; however, Dr. Kenny admitted that he did not see Mrs. McEwen following her visit in June of 1976. More specifically, Dr. Kenny admitted that he did not see Mrs. McEwen on March 4,1977, and, therefore, could not testify as to whether or not she had testamentary capacity on that date.
Dr. Edgar Hull, the medical director at St. Margaret’s Daughters Nursing Home, treated Mrs. McEwen in 1976 and 1977. In his testimony, introduced by way of deposition, he stated that he did not believe Mrs. McEwen could have had a lucid interval in March of 1977. However, Dr. Hull did not visit Mrs. McEwen on March 4, 1977 and could not testify as to whether or not Mrs. McEwen was lucid on that date.
Mrs. Margaret Wall, a registered nurse at St. Margaret’s Daughters Nursing Home, testified that her records from March, 1977 indicated Mrs. McEwen’s mental status was “disoriented and confused”. However, Mrs. Wall’s report was a monthly summary and she admitted that she did not have a record of Mrs. McEwen’s mental status on March 4, 1977. Mrs. Wall further stated that it was her experience that senile patients could have lucid intervals from time to time. Mrs. Wall also testified that Mrs. Hartenstein visited Mrs. McEwen frequently at the nursing home and that she did not recall visits from any other relatives of Mrs. McEwen.
The defendant, Mrs. Hartenstein, testified that although she and her aunt, Mrs. McEwen, did not have a close relationship prior to her aunt’s interdiction, she agreed to handle the interdiction and asked to be named Mrs. McEwen’s curatrix because Mrs. McEwen did not have any other close relatives living nearby who would be able to take care of her affairs. However, Mrs. Hartenstein and Mrs. McEwen developed a close relationship after Mrs. McEwen’s interdiction and Mrs. Hartenstein visited Mrs. McEwen frequently at the nursing home. Mrs. Hartenstein admitted that she and Mrs. McEwen discussed Mrs. McEwen’s wishes for the distribution of her estate upon her death. Mrs. Hartenstein suggested that Mrs. McEwen draft a will specifying her intentions. On March 4, 1977, Mrs. McEwen decided to follow Mrs. Hartenstein’s suggestion and drafted an olographic will which read as follows:
“March 4, 1977 -
I leave my niece, Marion Hartenstein, everything that I die possessed of.
Mrs. Jenny McEwen”
Mrs. Hartenstein testified that Mrs. McEwen asked her that day’s date but that Mrs. McEwen composed the will in her own words and wrote, dated, and signed it in her own handwriting.
One of the plaintiffs, Mrs. Martha Cavó-la, another niece of the decedent, testified that Mrs. Hartenstein and Mrs. McEwen *707 did not speak to each other for many years prior to the interdiction and that Mrs. Har-tenstein initially refused to handle Mrs. McEwen’s interdiction. However, Mrs. Ca-vóla admitted that Mrs. Hartenstein did handle the interdiction alone. Mrs. Cavóla visited the decedent on March 20, 1977 and found her to be confused and disoriented; however, she admitted that she did not see the decedent on March 4, 1977 and could not testify as to her mental condition on that date. Mrs. Cavóla also admitted that the will was in the decedent’s handwriting but claims that the decedent would not have been familiar with the terminology used in the will.
At the close of the plaintiffs’ case, the defendant moved for a directed verdict alleging that the plaintiffs had failed to prove the defendant’s incapacity at the time of the will’s confection. The trial judge granted the directed verdict in favor of the defendant and upheld the olographic will of March 4, 1977.
The main issue in this case is whether or not the decedent had the mental capacity to know what she was doing when she wrote the will. No doctor visited Mrs. McEwen on March 4, 1977 and the nursing home records did not indicate Mrs. McEwen’s condition on that date. The only testimony as to Mrs. McEwen’s mental capacity on that date was that given by Mrs. Harten-stein who stated that Mrs. McEwen was lucid and was mentally capable of confect-ing the will. According to Civil Code Article 1472, “it is sufficient if the capacity of giving exists at the moment the donation is made.”
The trial judge stressed that the court’s main task is to carry out the intent of the deceased. Therefore, he concluded that although Mrs. Hartenstein and the decedent did not have a close relationship prior to the decedent’s interdiction, the fact that Mrs. Hartenstein did take care of the decedent from the time of her interdiction until her death makes its reasonable and understandable that Mrs. McEwen would bequeath her estate to Mrs. Hartenstein.
On appeal, plaintiffs claim that the trial judge erred in finding that the decedent had the mental capacity to confect a will on March 4, 1977. Furthermore, they claim that Mrs. Hartenstein’s testimony as to the decedent’s mental capacity on that date was self-serving and should be given less weight than that of disinterested witnesses.
A party alleging lack of testamentary capacity must overcome the presumption of capacity by clear and convincing evidence. Succession of Lyons, 452 So.2d 1161 (La.1984). The plaintiffs have not introduced any evidence establishing the decedent’s mental incapacity on March 4, 1977.
Therefore, we affirm the trial judge’s decision upholding the will of March 4,1977 and dismissing the plaintiffs’ petition at their cost. Additionally, defendant’s petition requesting damages for a frivolous appeal is dismissed as meritless.
AFFIRMED.

. LSA-C.C. art. 1588 states:
The olographic testament is that which is written by the testator himself.
In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the State.